**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROSEANN ROSNICK,                          )
                                          )
Plaintiff,                                )
                                          )    Civil Action No. 23-891
            v.                            )    Judge Nora Barry Fischer
                                          )
NORBERT, INC.,                            )
                                          )
Defendant.                                )

<u>**MEMORANDUM OPINION**</u>

## I.    INTRODUCTION

Currently pending before the Court are Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment - Docket Nos. 33 and 38, respectively - in this employment discrimination lawsuit brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA").[1]   In addition to claims for discrimination and retaliation under the aforesaid acts, Plaintiff – a former Administrator of Defendant's personal care home - also brings claims under the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa. Stat. Ann. § 2601.1, *et seq*, for an unpaid portion of her contractually-owed bonus and paid time off ("PTO").[2]   *See*

---

[1] As noted in Section V(A)(1), *infra*, the PHRA is construed consistently with interpretations of the ADEA and the Court of Appeals for the Third Circuit has determined that a single analysis of Plaintiff's claims under both statutes (hereafter the "ADEA") is appropriate.

[2] As also discussed in Section V(B), *infra*:

   (a) the WPCL applies where an employee has a contractual right to payment; and

   (b) Plaintiff's claim for unpaid PTO, although not specified in the WPCL Count of her October 2023 Amended Complaint, has been known to Defendant and included in the parties' litigation exchanges and discovery (including

*generally,* Docket No. 23 (Plaintiff's Amended Complaint). In her primary claim, Plaintiff alleges that Defendant, having recently inquired of her retirement plans, demoted her and when she protested that discriminatory treatment, terminated her employment and replaced her with a significantly younger employee. (Docket No. 23; Docket No. 67 at 2). Defendant responds that, because Plaintiff was dissatisfied with her position throughout her six-month interval of employment,[3] it created Plaintiff's "dream job" pursuant to her own request, employed another Administrator vetted by Plaintiff in the course of her apparent acceptance of the proffered position, and therefore accepted Plaintiff's resignation when she declined to assume the newly-created position shortly thereafter. (Docket Nos. 24 and 34).

Defendant seeks summary judgment in its favor on Plaintiff's claims in their entirety, while Plaintiff seeks summary judgment only on her WPCL claims. Upon careful consideration of the parties' submissions and the evidence of record, and for the reasons set forth below, (a) Defendant's motion is granted as to Plaintiff's ADEA claim of retaliation and denied as to her other claims, and (b) Plaintiff's motion is denied.

In brief, the material fact questions with which this action is rife preclude summary judgment in either party's favor not only on Plaintiff's claim for age discrimination under the ADEA but also on that for a contractually owed bonus and/or PTO under the WPCL. The Court

---

Plaintiff's deposition) for some time. If a procedural challenge to this PTO claim were raised hereafter by way of motion, the Court would be inclined – given the clear absence of prejudice – to grant Plaintiff leave to amend her Complaint to resolve any doubt. *Cf.* Docket No. 34 at 7, n. 2 ("While Ms. Rosnick believes her Complaint includes a claim . . . for alleged unpaid [PTO], the Complaint is devoid of any facts to properly plead such a claim . . . ."); *id.* at 24 ("[A]ny claim for unpaid PTO was not properly alleged in the First Amended Complaint and is not properly before this Court."); *id.* (refuting claim on the merits with citation to evidence). The Court further notes, however, the modest evidentiary support for this claim despite its sufficiency to withstand summary judgment. *See* Sections II and V(B)(2)*, infra.*

[3] *See, e.g.*, Docket No. 24 at ¶ 14 ("Plaintiff expressed dissatisfaction with her position throughout her employment."). The Court notes that the record suggests somewhat dissatisfactory employment relationships between not only Plaintiff and Defendant, but between Defendant and its relatively short-term prior and subsequent Administrators as well.

concludes that – excepting her claim of retaliation, which will be dismissed – a jury could reasonably find that the record evidence, viewed under the applicable standards, sufficiently supports *each* of Plaintiff's claims to reach a verdict in her favor. The Court further concludes, however, that a jury could also reasonably find that there is insufficient evidentiary support for *any* of said claims, such as by finding that both (a) Defendant's termination of Plaintiff's at-will employment was a legitimate business decision based on considerations other than Plaintiff's age and (b) Plaintiff has not carried her burden of proof as to entitlement to PTO (or perhaps even as to a remaining unpaid bonus) under the WPCL.

## II.    FACTUAL BACKGROUND

The following facts are relevant and evidenced of record. *See generally* Docket Nos. 40 and 41 (Plaintiff's Concise Statement of Material Facts and Appendix ("Plaintiff's CSMF" and "Plaintiff's Appendix")) (referencing depositions and other exhibits of record); Docket Nos. 35 and 36 (Defendants' Concise Statement of Material Facts and Appendix ("Defendant's CSMF" and "Defendant's Appendix")) (same). *See also generally* Docket Nos. 50 (Plaintiff's Response to Defendant's CSMF) and 54 (Defendant's Reply). Further evidentiary submissions were filed as Appendices to the parties' Responses in Opposition to the pending cross motions for summary judgment. *See* Docket Nos. 46 (Defendant's Response Exhibits) and 49 (Plaintiff's Response Exhibits). As reflected throughout this Section, a substantial number of material facts are contested (in part for want of what would often be routine employment records) and/or lack a necessary degree of clarity/consistency even as to a party's own evidence/position.

*Plaintiff's Employment Background and Spring 2021 Hiring by Defendant*

Plaintiff was a personal care home administrator for nearly 40 years, including 20 years as administrator of Oakleaf Personal Care Home ("Oakleaf"), where her duties included overseeing

the day-to-day operations of the facility, supervising between 25-30 staff and 60-65 residents, managing the building, working with contractors and handling marketing. She was introduced to Hal Waldman ("Waldman"), owner of Defendant's personal care facility ("Norbert"), by Valerie Kirik ("Kirik"), a former colleague and nurse at Oakleaf.[4] Plaintiff met with Waldman at Oakleaf in March 2021, to discuss employment opportunities, as the owner of Oakleaf intended to discontinue operations. While exploring a potential transition with Waldman, Plaintiff prepared a writing of "general bullet points" of her preferred job functions for the new full-time position they were discussing creating at Norbert.[5] Waldman then offered Plaintiff employment and requested that she bring 20 selected staff members and the remaining Oakleaf residents to Norbert. (Docket No. 40 at ¶¶ 1-9).[6] Plaintiff began employment at Norbert in early July, 2021. (Docket No. 35 at 2-3).

*Plaintiff's Preference for Customer Service Role; Defendant's Administrator Role; Transfer of Norbert Personal Care Home Oversight from Waldman to Kelly Waldman*

As Jared Aiello ("Aiello") was then Norbert's Administrator and Plaintiff preferred to take on a customer service role, Plaintiff was intended "to help . . . the [Oakleaf] residents and families settle in [and then] start a customer service position at Norbert". When Aiello "was terminated a

---

[4] Kirik had worked at Norbert several years prior and returned to employment there from February of 2021 until resigning in February 2022. *See* Docket No. 40 at ¶ 7 (citing Kirik Dep. at 11:06-11;13:08-12). The Court notes that the events at issue herein occurred during the pandemic and its widely disruptive effects, including on residential care facilities.

[5] *See* Docket No. 50 at 5, ¶ 41 (In March 2021, Waldman and Plaintiff discussed a "regional Chief Experience Officer position at Norbert . . . which had the same duties of the [later proposed] quality assurance position but [that] was specifically tailored to [the Norbert care home] only"). Both page and paragraph numbers are provided for citations to Docket No. 50 as paragraph numbering begins anew mid-way through this pleading, thus requiring differentiation.

*See also* Docket No. 49-17 (Plaintiff's Chief Experience Officer list of eight bullet points, headed "Initial Thoughts" regarding Plaintiff's "Role"). Plaintiff's list describes interfacing for the organization – with a parenthetical "[initially Norbert Personal Care Home]" – and contains a handwritten note reading "VP of H. Waldman Holdings".

[6] The parties dispute the number of staff who transferred from Oakleaf with/were brought to Norbert by Plaintiff. *See, e.g.*, Docket No. 50 at 2, ¶ 8.

month into [Plaintiff's] employment", however, she assumed the Administrator role to provide stability to "newly transferred residents and families" and avert "further changes in staff". (Docket No. 40 at ¶ 10; Docket No. 50 at 2, ¶ 17). *See also* Docket No. 49-1 at 21.[7]

Shortly after Plaintiff began work at Norbert, Waldman transferred oversight of the facility to his daughter, Kelly Waldman. And although Plaintiff had stepped in as Administrator, she was soon openly disappointed with that role - and Ms. Waldman's fiscal expectations and the "cuts" Plaintiff was then asked to make - because what she had been promised by Waldman did "not come to fruition". In addition, Plaintiff was unaware of the role/responsibility Ms. Waldman would have regarding the Oakleaf transition/Norbert, and regretted that Ms. Waldman had not been included in her hiring conversations. (Docket No. 49-1 at 22). When "it became clear that the team and the promises [made to Plaintiff] were falling apart", Plaintiff asked to bring key staff/team members to a meeting. At that time (late September), she was no longer comfortable speaking to Ms. Waldman without others (including Waldman, "at least one" of the nurses (*e.g.* Kirik), and perhaps other key staff members) present. Ms. Waldman declined to include additional attendees (apart from agreeing to invite Waldman) and advised Plaintiff in writing that "given the tone" of her communications, they "needed to meet privately", adding that "all operational controls [had] been turned over to" Ms. Waldman by her father. Plaintiff then declined to meet. (Docket No. 49-1 at 23-26).[8]

---

[7] *See also* Docket No. 35 (Defendant's CSMF) at 3-4 (similarly describing Plaintiff's initially anticipated role and Waldman's request that she replace Aiello, with whom Defendant was unhappy, as Administrator).

[8] *See also* Docket No. 49-1 at 25 (Plaintiff was "shocked to find out . . . two months in" that Waldman "had turned everything over" to Ms. Waldman. *Cf.* Docket No. 35 at 1-2 (Waldman opened Norbert personal care home in 1983 and in July, 2021 Ms. Waldman assumed day-to-day oversight as its owner/president).

*December 2021 Holiday Conversation Exchange Regarding Retirement*

"[T]hree weeks before [Plaintiff] was terminated" in mid-January, 2022, Waldman "suggested that she should retire because of her age." (Docket No. 50 at 6, ¶ 54).[9]  More specifically, Waldman and Plaintiff had a brief discussion in which he noted how difficult the pandemic had been for everyone, including those in the personal care home business, and that he was ready to retire and encouraging Ms. Waldman to also leave the business.  He asked Plaintiff if she, being he believed approximately the same age, was ready to retire.  Plaintiff replied that she was "absolutely not" and would "know when it's time".  (Docket No. 61 at 16-17).[10]

*Regional Quality Assurance Consultant Position and Conclusion of Employment*

Plaintiff met with Ms. Waldman at the latter's request on January 4, 2022 to "strategize for 2022" and Ms. Waldman suggested that Plaintiff transfer to a newly created position of Regional Quality Assurance Consultant ("RQAC").  Ms. Waldman created the role to address Plaintiff's "expressed displeasure with the Administrator position" and to "fit her interests."  *See* Docket No. 49-1 at 26; Docket No. 53 at 6.  Plaintiff was initially excited about finally transitioning to the customer service role she discussed with Waldman nine months earlier.  But after (1) realizing the offered role was a "significant decrease in compensation, benefits" and scope, (2) discussing it with her accountant, and (3) learning that "her position as Administrator

---

[9] As set forth below, both the material fact of Plaintiff's termination (vs. voluntary resignation) and its date present questions of fact.  Plaintiff is unclear, *e.g.*, as to the date on which she alleges she was terminated – *e.g.*, January 16, 2021 (when Ms. Waldman accepted Plaintiff's "resignation" from the position available to her) or January 18, 2021 (when Plaintiff was ordered to leave the Norbert premises, the locks to the facility were changed and she was removed from Defendant's payroll)). (Docket No. 58 at 2, 7).  The Court observes that either mid-January action was within Plaintiff's July 15, 2022 EEOC and PHRA filing windows.  Moreover, the parties do not dispute that Plaintiff continued to perform the duties of her Administrator position until January 18, 2021. *See* Section V(A), *infra*.

[10] Defendant disputes that Waldman was in Pennsylvania at the time alleged, that the conversation occurred, and that Waldman had any decision-making role/authority in December 2021-January 2022.  (Docket No. 61 at 17).  *Cf. id.* at 17-18 (ambiguities regarding transfer of ownership, operational control, positions of authority/decision-making as to the Norbert facility from 2019 through 2021).

was terminated because Ms. Waldman had already replaced her" with Misty Ison ("Ison"), Plaintiff's excitement dissipated. (Docket No. 50 at 4, ¶ 32).[11]

Plaintiff met with Ison – with whom Ms. Waldman had discussed the Administrator position in late 2021 and whom she proposed as a candidate – in January, 2022. But Ms. Waldman then informed Plaintiff "she had hired Ms. Ison on January 4, 2022, and . . . wanted to announce Ms. Ison as the new administrator on January 10, 2022." (*Id.* at 4, ¶¶ 36, 39). Ms. Waldman replaced Plaintiff before "offering . . . any alternate positions" and "after the fact", offered Plaintiff a 20-hour position, with "no benefits and that paid significantly less than her previous position". Ms. Waldman "did not communicate . . . that she intended for the position to grow over time." *See e.g.*, *Id.* at 3, ¶¶ 25, 28, 30.[12] Plaintiff never accepted the position offered by Ms. Waldman by word or writing; Ms. Waldman simply "erroneously conflated [Plaintiff's] initial excitement with acceptance." (*Id.* at 4, ¶¶ 36, 39).[13]

---

[11] *See also* Docket No. 58 at 4-5. Plaintiff's evidence and testimony appear somewhat conflicted as to the time sequence in which (a) Ms. Waldman first broached the RQAC position, and when Plaintiff (b) met with Ison, was excitedly considering the position and met with her accountant, (c) was threatened with termination if she did not accept, and (d) learned Ison was hired into (as opposed to being considered for/negotiated with regarding) Plaintiff's Administrator position (thus terminating Plaintiff's employment unless she accepted a transfer/demotion). *Compare, e.g.*, Docket No. 50 (averments of Plaintiff's Response to Defendant's CSMF, cited in text) *with e.g.*, Docket No. 49-15 (Plaintiff's January 18, 2021 email to Ms. Waldman referencing "when [they] first spoke about this development in early January" and appearing to refer to the January 4th meeting as one in which Plaintiff was simultaneously told that Ison had been hired as Administrator, the RQAC was described and proposed in its stead, and Ms. Waldman threatened/pressured Plaintiff that if she didn't accept that demotion, they would "be having a conversation . . . about her severance").

[12] *Cf.* Docket No. 34 at 16 (asserting, as "core facts" in support of its unassailably legitimate reason for Plaintiff's termination, that Defendant "intended for the new role to grow over time", the position offered Plaintiff was "merely a starting point" because it was "newly created", and Norbert "currently employs a Regional Director of Marketing, who performs many of the functions Ms. Waldman intended" Plaintiff would ultimately perform). *See also* Docket No. 35 at 5.

[13] *See also id.* at 5, ¶¶ 45, 49 (Plaintiff "did not resign from her position as administrator because she had been replaced by [Ison] as early as January 4, 2022" when Ms. Waldman informed Plaintiff that she had "found Ms. Ison as a replacement . . . new administrator"). As noted *supra*, n. 10, this account of a same-day sequence of events appears in tension with Plaintiff's account of an interval of "excited" and interested exploration of an RQAC position with Ms. Waldman.

It also differs from Defendant's contention that (a) the RQAC position and Ison were proposed to Plaintiff on January 4th, at which time Plaintiff expressed interest and then met with and appeared to endorse Ison on the 11th; and (b) Ms.

On January 14, 2022, Plaintiff had a conversation with Ms. Waldman in which she declined the RQAC position. (*Id*. at 5, ¶ 47). On January 16th, Ms. Waldman wrote to Plaintiff that "[b]ased on [their] conversation on January 14th, it was [her] understanding that [Plaintiff had] declined [Defendant's] offer of the role of [RQAC] and [had] instead elected to resign" and Ms. Waldman thus "accepted [Plaintiff's] resignation and [would] proceed with Misty Ison immediately assuming the position of Administrator . . . ." (Docket No. 49-16). Plaintiff replied by email of January 18th that "[a]s a point of clarification, [she] did not and [was] not resigning from [her] position as Executive Director of Norbert". (Docket No. 49-15).[14] Plaintiff was "cut off from [her] computer" and "locked out of the building" on January 18, 2022. (Docket No. 49-1 at 25).[15] She "did not realize she was being discriminated against on the basis of her age until after she was terminated . . . and replaced with Ms. Ison." (Docket No. 50 at 6, ¶ 56).

*Negotiation and Entitlement to PTO Accrued at Oakleaf*

During their conversations regarding Plaintiff's potential employment, Plaintiff and Waldman discussed the transition of Oakleaf staff to Norbert. Plaintiff conditioned her acceptance of employment on her own and the transferring staff's retention of the PTO accrued during their

---

Waldman – believing the only open question to be whether the RQAC position would be a 1099 consultant position "for tax purposes" or a W-2 employee position - offered Ison, then aged 59, the Administrator position on the 12th. (Docket No. 35 at 4-7). And the Court notes again the parties' ambiguities, in this case regarding Defendant's hiring of another Administrator before or after Plaintiff declined the proposed transfer on January 14th. *See, e.g.,* Docket No. 49-16 (Ms. Waldman's email of January 16th accepting Plaintiff's resignation and indicating her intent to "proceed" with Ison); Docket No. 61 at 8-11 (Defendant sent an offer letter to Ison on the 16th, but there had also been an offer on the 12th, which was verbal); text, *infra*. The record also appears unclear as to the date of Ison's acceptance, but presumably it was after the written offer of January 16th.

[14] This email goes on to (a) assert that Ms. Waldman hired Ison prior to suggesting that Plaintiff become the RQAC, a "consultant role" with a "considerable reduction in pay, involuntary reduction of hours, [and] a total loss of benefits" and (b) object that the hiring was done unilaterally and "without cause or notice". *Cf. generally* evidence of record and absence of dispute that Plaintiff's employment was at-will; Docket No. 61 at 42, 45 (2018 Handbook provision at Section 11.11 that "employment may be terminated at any time with or without notice and with or without cause").

[15] *Cf.* Docket No. 24 at 4 (Ms. Waldman asked Plaintiff not to return following her disparaging remarks regarding Ms. Waldman, including those made to her staff).

employment at Oakleaf, and Waldman agreed.[16]  Plaintiff's January 27, 2022 post-termination pay

stub (for the pay period January 8 to January 22, 2022) reflected over 284.3 hours of accrued PTO.

(*Id.* at 9, ¶¶ 11-12). Defendant's employee Michelle Amlund handled inputting the accrued unused

PTO for Norbert employees, including Plaintiff, who was not responsible for inputting any PTO

into Norbert's system.  Based on her annual salary of $120,000, Plaintiff is owed $16,472 for

unpaid, unused PTO due upon her termination. (*Id.* at 10, ¶¶ 19-20). [17]

> *Negotiation and Entitlement to Bonus for Transfer of Oakleaf Residents*

On July 22 and 23, 2021, Plaintiff and Waldman discussed her employment and the

Oakleaf-Norbert transition, including his "decision to give [Plaintiff] a bonus for the residents"

who relocated.  The evening of July 23, she emailed Waldman with information regarding the

number of residents (assertedly 35 total) and their respective residential care rates.  In that email,

---

[16] Plaintiff's understanding with Waldman was that individuals transferring from Oakleaf would "bring with" them (*i.e.*, "retain") the PTO they had accrued at Oakleaf rather than "start over" as a "brand new employee", and then their Norbert PTO would "just continue to grow".  (Docket No. 49-1 at 42).

Nurse Kirik also knew that Waldman promised that transferring staff would retain seniority, vacation and PTO earned at Oakleaf.  (Docket No. 40 at ¶ 24).

[17] Defendant disputes as matters of material fact both (a) the existence of any oral agreement/contract between Waldman and Plaintiff as to carry-over PTO and (b) as discussed *infra*, any PTO payment obligation at all under the benefit provisions of its assertedly applicable 2022 employee Handbook.  Defendant also initially included Plaintiff's own responsibility for employment/PTO records in its defense, asserting that Plaintiff would have been terminated for cause, as it became aware in March, 2022 that she was improperly performing her duties regarding employment/payroll recordkeeping for her staff.  (Docket No. 24 at 3).  Further advancement of that argument does not, however, appear to be included in later filings.

*Cf.* Docket No. 49-1 at 43, 45 (Plaintiff's saying she has carry-over/accrued PTO of 283.4 hours "comes from that one [pay]stub . . .  If that was an error, [she] was not responsible"; however, she "has no reason to believe" it was.).  *Cf. also* Docket No. 49-10 at 38-39, Section 17.4 (Defendant's June 2018 Handbook providing for employees' PTO, beginning one year after employment, "accumulating . . . each pay period worked", accruing in amounts related to length of service with Norbert, and available for certain uses at employee's discretion with notice and approval).

As the above suggests, the evidentiary record, including deposition testimony, indicates clearly only the substantial *lack* of clarity that will confront the jury – even in Defendant's payroll records.  *See, e.g.*, Docket No. 49-1 at 41-45 (discussing documents and apparent inconsistencies and omissions from recordkeeping regarding employees' PTO generally); *id.* (also discussing the challenges of reconciling Plaintiff's years of service, oral/written contractual entitlements to Oakleaf carry-over PTO and/or Norbert employment PTO, Plaintiff's use of either form of PTO, and the determination of the amount of this claim).

Plaintiff writes to Waldman that she "trusts that [he] will calculate what [he] believe[s] to be a fair bonus for the work [Plaintiff] did to prepare for and bring [these] residents to Norbert." Her email continues:  "As we discussed yesterday, 50% of said bonus will be in the paycheck I will receive next week on July 29th and the remaining 50% in one of the paychecks in January, 2022.  Thank you so much for your generosity!"  (Docket No. 49-6).[18]

Defendant then paid Plaintiff a bonus of $28,000 on July 29, 2021.[19]  Plaintiff accepted that payment and believed the second 50% of her bonus would be paid in January 2022.  On January 7, 2022, Plaintiff sent an email reminding Waldman about the remainder of her bonus because (1) it was agreed to be paid that month and (2) Ms. Waldman had recently "informed [Plaintiff] that she was being replaced which terminated her position."  (Docket No. 50 at 12-13, ¶¶ 32-36).  In that email, Plaintiff wrote that while she understood the company was now Ms. Waldman's, the bonus Waldman decided upon was between Waldman and Plaintiff.  The email requests that – in accordance with the terms of the July 23rd email and July 29th pay stub attached – her January 13th check include the remaining balance owed.  (Docket No. 49-7).

That same day, January 7th, Waldman responded "thanks for the reminder", but the next day requested that Plaintiff provide an email sent her (presumably confirming a

---

[18] The Court again notes that while this litigation raises many questions that derive from the *parties'* differing factual accounts, some derive from a party's *own* differing factual accounts/proffers.  Here, Plaintiff's pleadings expressly allege that (a) Waldman promised Plaintiff a $2,000 payment for each of the 28 residents who transferred from Oakleaf with her, totaling $56,000 bonus compensation due, and (b) Rosnick's adult son, Jonathan, was present during a discussion and "agreement between [Plaintiff] and Norbert to pay her $56,000 as a bonus for residents brought over from Oakleaf".  *Id.* at 12, ¶¶ 28-31.  *Cf.* Docket No. 49-7 (Plaintiff's January 7, 2022 email asserting that "the bonus [Waldman] decided upon" was for Plaintiff's "bringing 35 residents to Norbert's").

*Compare* text *supra* (noting the record's quite plausible documentation of a contractual agreement for, *e.g.,*  a bonus in a "fair" amount (initially determined by Waldman) derived from the number of residents transferred and to be paid in two equal installments (with Defendant's first payment amount of $28,000 offered by check and accepted by Plaintiff)).  *See* Section V(A), *infra*.

[19] *See also* Docket No. 49-13 (July 11-24, 2021 pay period statement).

commitment/contract). (Docket No. 50 at 13, ¶¶ 37-38).  *See also* Docket Nos. 49-7 and 49-8 ("Would u mind sending me the email sent to you?").  Plaintiff responded: "Hal, as with everything between us, I was never given anything in writing. Just your word that you would follow through with what was promised. Thank you very much, R.", to which Waldman responded: "No problem". (Docket No. 49-8).  Ms. Waldman was aware of a contract bonus for transferred residents created by Waldman and discussed its payment with him.  When Plaintiff emailed Ms. Waldman on January 12, 2022 regarding her remaining bonus (Docket No. 49-4), the latter responded that she would look into it. (Docket No. 50 at 14-15, ¶¶ 42-48).[20]  The second $28,000 owing on Plaintiff's bonus remains unpaid.[21]

*Defendant's 2018 Handbook and Disputed Applicability of Later Revised Handbook*

Although Defendant avers that it revised and redistributed its Handbook in February 2021, Plaintiff avers that prior to beginning work that July, only the 2018 Handbook was distributed to her.  No 2021 Handbook was received or acknowledged in writing by Plaintiff.  Although the 2018 Handbook reserves the right to revision, it provides for timely communication "typically in a written supplement . . . or a posting on company bulletin boards".  No email, posting or other communication was made regarding its revision.[22]  During her February 2021 to February 2022 employment, Nurse Kirik  also received and possessed only a 2018 Handbook. (Docket No. 50 at 9-11, ¶¶ 15-16, 18, 25-26).

---

[20] *See also id.* at 6, ¶ 59 (Kelly Waldman did not know the terms/amount of the bonus agreed upon by Plaintiff and Ms. Waldman's father).

[21] In comparison, Defendant avers that Waldman decided to pay Plaintiff based on the 28 residents who transferred (together with 15-20 staff) by the beginning of July, 2021.  (Docket No. 35 at 3).

[22] *See, e.g.,* Docket No. 61 at 42, 46-47; *cf.* Docket No. 49-10 at 42-43 (unexecuted "Acknowledgement of Receipt and Review" pages of the 2018 Handbook).

Defendant's June 2018 Handbook PTO policies provide a one-year wait period for PTO for a full-time employee.  It further provides that upon termination or properly noticed resignation, an employee will be paid any accrued unused PTO.  (Docket No. 49-10 at 39, Section 17.4).  When Plaintiff was terminated in January, 2022 and Kirik resigned in February, 2022, that Handbook stated their understanding of the policy then in effect.  (Docket No. 50 at 10-11, ¶¶ 13-14, 25-26).[23]  The 2018 Handbook provision for end-of-employment compensation for unused PTO was not included in the February 2021 Handbook introduced of record by Defendant. (Docket No. 49-1 at 44).  Plaintiff alleges a negotiated oral contract for carry-over PTO with Waldman and  avers that the 2018 Handbook "permits her to be paid out under the PTO policy".[24]  Neither party asserts that any Handbook provision addresses an employee's entitlement to payment for PTO accrued with a prior employer as opposed to during employment with Defendant.

*Plaintiff's EEOC and PHRA Claims*

Plaintiff's claim of age discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") on July 15, 2022. Defendant disputes only the timeliness of her filing for purposes of the parallel provisions of the PHRA.  *See* discussion Section V(A)*, infra.*   Plaintiff was 69 during the time of her employment with Defendant and Ison was 59 at the time of her hiring as replacement Administrator.  *See, e.g.*, Docket No. 61 at 15.[25]

---

[23] Defendant's emailed employment offer to former administrator, Jared Aiello, stated the same policy provisions permitting payment for unused PTO at the end of employment.  (*Id.* at 11, ¶ 27) (citing Exhibit 12)**.** *Cf.* Section V(B), *infra* (addressing Defendant's objections to consideration of that email based on the current absence of authentication).

[24] *See e.g.*, Docket No. 61 at 48 (citing Plaintiff's deposition testimony and Handbook at Section 17.4).

[25] *See also* Docket No. 24 at ¶ 21 ("Norbert admits that Plaintiff's replacement is approximately 10 years younger than Plaintiff.").

### III.    PROCEDURAL HISTORY

Plaintiff commenced this action by filing her Complaint on May 27, 2023, and that Complaint's claim for discriminatory harassment was subsequently dismissed by Stipulation. (Docket Nos. 1 and 11).  An Amended Complaint was filed on October 11, 2023 and asserts the following claims against Defendant: Counts I and II - Age Discrimination, Harassment, and Retaliation Under the ADEA and the PHRA, respectively,[26] and Count III – Unpaid Wages previously earned under the WPCL, including an unpaid bonus. (Docket No. 23).  The parties completed fact discovery as to Plaintiff's claims and Defendant filed its Motion for Summary Judgment, Brief in Support, Concise Statement of Material Facts and Appendix on May 3, 2024. (Docket Nos. 32-36).  Plaintiff's Motion for Partial Summary Judgment, Brief in Support, Concise Statement of Material Facts and Appendix were filed on May 6, 2024.  (Docket Nos. 38-41).  The parties' Briefs in Opposition, Responses and Replies were filed during June 2024.  (Docket Nos. 44-46, 48-51, 53-55, 58).  The Court heard oral argument on said Motions on July 29, 2024 (Docket Nos. 33, 38, 59) and the Official Transcript ("Transcript") of those proceedings was entered of record on August 28, 2024.  (Docket No. 61).  At the Court's direction, the parties' supplemental briefs were filed on September 30, 2024.  (Docket Nos. 65 and 67).  The motions for summary judgment are thus fully briefed and ripe for disposition.

---

[26] *But see* Docket No. 34 at 7 n.1 (duly noting that although the Amended Complaint continues to reference harassment, "the parties stipulated to dismiss Ms. Rosnick's harassment claims on August 21, 2023").  Plaintiff has made no subsequent assertion of intent to pursue a claim of harassment. Given the apparent ministerial error underlying inclusion of this previously withdrawn claim in Plaintiff's Amended Complaint, and the parties' subsequent litigation history, Plaintiff's claims are deemed to be those set forth above.  The Court notes that it would be inclined to find a reasserted harassment claim unmaintainable under the applicable standards and given the evidence of record, including that of Plaintiff's EEOC Charge.

## IV.    APPLICABLE STANDARDS OF LAW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party,[27] the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a) & (c)(1)(A).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id*.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis added by *Matsushita* Court).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986).  In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  . . .  [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.

---

[27] *See e.g.*, *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007) (noting that the court must interpret the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id*. at 249-50 (internal citations omitted). *See also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record (a) presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution or (b) is so one-sided that the movant must prevail as a matter of law. It is on this standard that the Court has reviewed the parties cross-motions and responses thereto.

## V.    ANALYSIS

### A.    Plaintiff's Evidence Is Sufficient To a Reasonable Jury's Finding of Discriminatory Age-Based Termination, But Not of Forced Transfer or Retaliation, Under the ADEA and PHRA

#### (1) Statute of Limitations

#### The ADEA and PHRA Claims (Counts I and II)

Before a plaintiff may commence a federal civil action under Title VII of the Civil Rights Act of 1964, , 42 U.S.C. §§ 2000e *et seq*. ("Title VII") or the ADEA, she must file a timely charge of discrimination with the EEOC. *See, e.g., Gooding v. Warner–Lambert Co.,* 744 F.2d 354, 358 (3d Cir. 1984) (Title VII); *Bailey v. United Airlines,* 279 F.3d 194 (3d Cir. 2002) (ADEA). In a deferral state such as Pennsylvania, the time frame for such a filing is 300 days after the alleged unlawful employment practice occurs. *Baker v. Office Depot, Inc*., 115 F.App'x 574, 576 (3d Cir. 2004) (citing *Bailey,* 279 F.3d at 197)). If the challenged discrimination occurred before that time period,  the filing will be considered untimely. The statute of limitations for actions arising under the PHRA is 180 days. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 925 (3d Cir. 1997).

Defendant moves to dismiss Plaintiff's claims under the PHRA on grounds that they are barred by the PHRA's more restrictive 180–day window.  To that end, it alleges that: "[T]o the extent any adverse employment decision did occur, [Plaintiff] contends this decision occurred on January 4, 2021, when Kelly Waldman offered her an alternate position.  As such, her claims arising under PHRA are time-barred, as she filed her Charge . . . more than 180 days after the date she contends the adverse employment decision occurred."  (Docket No. 34 at 7-8).[28]    Plaintiff has, however, alleged adverse employment decisions of both demotion/transfer and termination.

As the Court concludes that the adverse employment decision on which Plaintiff's claim for age discrimination may proceed is her mid-January termination of January 16th or 18th,[29] and her Charge of Discrimination was filed on July 15, 2022, Plaintiff was within the statutory period as to said claim under both the ADEA and the PHRA.  *See* discussion, *infra*.  Moreover, the PHRA is construed consistently with interpretations of the ADEA and the Court of Appeals for the Third Circuit has determined that a single analysis of Plaintiff's claims under both statutes (hereafter the "ADEA") is appropriate.  *Davis v. Pittsburgh Pub. Schs.*, 930 F.Supp.2d 570, n.12 (W.D. Pa. 2013); *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citations omitted).  Plaintiff's claims under Counts I and II are collectively discussed hereafter by reference to the ADEA.

---

[28] *See also id.* at 10 ("[Plaintiff] contends the alleged adverse employment decision (*i.e.* when Ms. Waldman offered her the quality assurance role) occurred on January 4, 2022.  However [Plaintiff] did not file her Charge of Discrimination . . .  until 192 days later, on July 15, 2022. ") (citing Defendant's CSMF at ¶¶ 49, 51); Docket No. 53 at 4-5.

[29] *See* Section II & nn. 9-10, *supra*.

**(2) ADEA Claim of Discriminatory Forced Transfer and/or Termination**

**a. Applicable Burden-Shifting Framework**

Plaintiff claims that Defendant discriminated against her based on her age when it both demoted/transferred and then terminated her, in violation of the ADEA. The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." *See e.g., Willis*, 808 F.3d at 643-44 (quoting 29 U.S.C. § 623(a)(1)). And where, as here, a plaintiff relies on circumstantial evidence, courts apply the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Willis*, 808 F.3d at 644 (citation omitted).[30] Under this framework, a plaintiff must first establish a prima facie case of age discrimination by pointing to evidence supporting that she: (1) is at least forty years old; (2) suffered an adverse employment decision; (3) was qualified for the position in question; and (4) was ultimately replaced by someone sufficiently younger so as to support an inference of discrimination. *Id.* (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc)); *Britton v. Oil City Area Sch. Dist.*, 744 F.App'x 53, 55-56 (3d Cir. 2018).[31]

The question of whether a plaintiff has established her *prima facie* case is a question of law to be determined by the court. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Sarullo*

---

[30] Although the Supreme Court formulated the *McDonnell Douglas* framework in cases involving Title VII, the United States Court of Appeals for the Third Circuit has consistently applied that framework in cases where direct evidence of discrimination is not presented and which arise under federal antidiscrimination statutes, including the ADEA. *Smith v. City of Allentown*, 589 F.3d 684, 689–91 (3d Cir. 2009); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007); *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300–01 (3d Cir. 2004); *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996). The *McDonnell Douglas* framework is also used to evaluate retaliation claims arising under federal antidiscrimination statutes.

[31] A prima facie case raises an inference of discrimination sufficient to shift the burden of production to the defendant because the court presumes that certain actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). *See also Venter v. Potter*, 694 F.Supp.2d 412, 422 (W.D. Pa. 2010), *aff'd*, 435 F.App'x. 92 (3d Cir. 2011).

*v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003)).  When that determination is made in her favor, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Willis*, 808 F.3d at 644 (citing *McDonnell Douglas,* 411 U.S. at 802). Once the employer carries its burden, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons proffered by the employer were not the true reasons but were merely a pretext for discrimination.  *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). At all times, the ultimate burden of proving intentional discrimination remains with the plaintiff. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action." *Willis*, 808 F.3d at 644 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)); *Britton*, 744 F.App'x at 56 (same).[32]

### b. Plaintiff's Prima Facie Case

The parties do not dispute the first and third factors of Plaintiff's prima facie case, *i.e.*, that Plaintiff was 69 years of age and was qualified for her position at the time of the alleged harms. But Defendant argues that Plaintiff has failed to satisfy the second and fourth factors,[33] and the Court will address each in turn.

*Second Factor*

As to the second factor: An adverse employment action sufficient to state a claim of age discrimination involves "a significant change to employment status, such as hiring, firing, failing

---

[32] *See also Jeffery v. Erie Cnty. Pennsylvania,* 2024 WL 1257347, at *2 (W.D. Pa. Mar. 25, 2024); *Murphy v. Ctr. For Emergency Med. of W. Pa.*, 944 F. Supp. 2d 406, 428 (W.D. Pa. 2013) ("It is not sufficient to simply show that age was a motivating factor.").

[33] *See* Docket No. 34 at 7 ("[Plaintiff] cannot establish a prima facie case of discrimination because she cannot present evidence demonstrating that Norbert took an adverse employment action against her, nor can she establish that she was replaced by an employee who was sufficiently younger so as to support an inference of discriminatory motive.").

to promote, reassignment or a decision causing significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999). It must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (internal quotation marks omitted). "Although direct economic harm is an important indicator of a tangible adverse employment action, it is not the *sine qua non*. If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." *Evans*, 166 F.3d at 153 (citation omitted).

Plaintiff avers that she suffered age discrimination in violation of the ADEA when Defendant "demoted [her] . . . to a part-time, lesser-paid position". (Docket No. 67 at 2). But Plaintiff has failed to provide evidence from which a reasonable jury could find that she was either transferred or demoted – rather than that she was encouraged or pressured/"threatened" to accept a proposed transfer to a lesser position. Indeed, Plaintiff has averred that her Administrator position - including title, hours and compensation - remained unchanged prior to termination of her employment in mid-January, 2021. *Compare* Docket No. 61 at 50-51; Docket No. 49-1 at 44 (Plaintiff's testimony that her salary remained the same through her end of employment) *with* Docket No. 67 at 5 (averring that Plaintiff "endured . . . a demotion in title, pay and responsibilities"). *See also* Docket No. 34 at 11 ("[Plaintiff] alleges that Norbert['s] . . . offering her an alternate position . . . was a demotion, 'in terms of a thinly veiled attempt to induce her to quietly resign on her own.'") (citing Docket No. 23 at ¶¶ 14-15; CSMF at ¶¶ 30-31); Docket No. 65 at 2 (Defendant's averment that Plaintiff "never actually assumed the duties associated with

[the RQAC] role *(i.e.,* she never actually transitioned to the role)").[34]  Nor has Plaintiff alleged that she was significantly impeded from performing her role of Administrator prior to her termination.    The Court concurs with the conclusion of its sister Court in the Northern  District of Ohio that an employer's offer of a position which the employee is pressured to accept does not constitute an adverse employment action under Title VII or the ADEA.  *Rose v. Buckeye Telesystem, Inc*., 181 F.Supp.2d 772, 777–78 (N.D. Ohio 2001) (dismissing plaintiff's contention "that she suffered an adverse employment action because she was pressured to accept a demotion" where she "never accepted [that] position, [but] remained" in her then-current position until termination); *id.* (noting that "a mere employment offer cannot be a materially adverse change in the terms and conditions of employment where the employee's job has remained unchanged").

However, Plaintiff also alleges, and sufficiently supports in the record, that she suffered age discrimination in violation of the ADEA when Defendant terminated her employment.  More specifically, Plaintiff's employment with Defendant ended in mid-January, 2021 and the record reflects material fact questions (based significantly in the parties' conflicting testimony and emails for want of other written employment records) regarding the voluntary or involuntary nature of the cessation of Plaintiff's work at Defendant's facility, their employment relationship and Defendant's reason(s) for termination.  *See* Sections V(A)(2)(c)-(d), *infra*.

*Fourth Factor*

The second factor having thus been met as to discriminatory termination, the Court turns to the fourth and final factor of the prima facie case, *i.e.*, that Plaintiff was replaced with a

---

[34] In the absence of a material fact question of forcible transfer/demotion, the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 144 S.Ct. 967 (2024), has no potential applicability to the case *sub judice.  See id*. at 971-72 ("Although an employee must show some harm from a forced transfer to prevail in a Title VII suit, she need not show that the injury satisfies a significance test. Title VII's text nowhere establishes that high bar."); *id.* (clarifying that a claim of discriminatory *transfer* under Title VII is not subject to a heightened standard); *id.* (abrogating cases to have imposed additional evidentiary requirements). *See also* Docket No. 65 at 2 (asserting M*uldrow*'s factual inapplicability as "Plaintiff neither was forced to nor actually assumed the new role").

sufficiently younger person to create an inference of discriminatory motive. "A sufficient age difference between Plaintiff and the person who was given the [promotion/position] from which a fact finder could reasonably conclude that the employment decision was made on the basis of age is sufficient to meet the fourth element of an ADEA prima facie case." *Kupetz v. Pittston Area Sch. Dist.,* 2018 WL 3833505, at *4 (M.D. Pa. Aug. 13, 2018) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 730 (3d Cir. 1995) and *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 792 (3d Cir. 1985)).

The individual hired to assume Plaintiff's role as Administrator was ten years her junior. (Docket No. 23 at ¶ 21; Docket No. 24 at ¶ 21). The Court finds this age difference sufficient. *See Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999) (finding age differences of 8 and 16 years between plaintiff and retained employees sufficient); *id.* (citing *Sempier*, 45 F.3d at 730, as "holding that the fourth prong of a prima facie age discrimination case was satisfied where plaintiff was replaced by two individuals – one who was four years younger than plaintiff and the other who was ten years younger"). *See also id.* ("In order for a plaintiff to satisfy the 'sufficiently younger' standard, we have noted that there is no 'particular age difference that must be shown,' but while '[d]ifferent courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot.'") (quoting *Sempier,* 45 F.3d at 729).[35] That Plaintiff's

---

[35] *Cf. Umbria v. Valley Forge Casino Resort,* 2022 WL 507483, at *5 (E.D. Pa. Feb. 18, 2022) (finding insufficient age difference of less than five years younger where no other facts of record supported an inference of discrimination):

> There is no bright-line rule defining what age differential is required to meet the "sufficiently younger" standard. Some courts have found an age differential of slightly less than five years to be sufficient to satisfy the standard. *See, e.g., Carter*, 228 F. Supp. at 904 (finding a differential of four years and five months to be sufficient); *Robinson v. Matthews Int'l Corp.*, 2009 WL 735876 (W.D. Pa. Mar. 20, 2009), *aff'd*, 368 F.App'x 301 (3d Cir. 2010) (finding a four-year age differential to be sufficient). However, most courts within this circuit have required an age differential of at least five years. *See, e.g., Gutknecht v. SmithKline Beecham Clinical Labs., Inc.*, 950 F. Supp. 667, 672 (E.D. Pa. 1996); *Knox v. Fifth Third Bancorp*, 2014 WL 359818, at *13 (W.D. Pa. Feb. 3, 2014); *Martin v. Healthcare Business Resources*, 2002 WL 467749, at *5 n.7 (E.D. Pa. March 26, 2002); *Lloyd v. Cty. Of Bethlehem,* 2004 WL 540452, at *6 (E.D. Pa. Mar. 3, 2003).

replacement was also a member of the protected class (*i.e.* over age 40) does not affect this conclusion, as the cases cited in Defendant's own briefing reflect. *See* Docket No. 34 at 12-13.[36]

### c. Defendant's Proffered Legitimate Non-Discriminatory Reason

The burden now shifts to Defendant to articulate a legitimate, non-retaliatory reason for its employment action, and said burden is "relatively light." *Fuentes*, 32 F.3d at 763. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Rather, the inquiry concerning whether Defendant met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily precedes the credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion" that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Fuentes*, 32 F.3d at 763.

Defendant asserts that Kelly Waldman, "knowing Plaintiff's distaste for her then-Administrator role, (1) created a wholly new role for Plaintiff – which incorporated Plaintiff's previously drafted 'dream job' duties and responsibilities – and (2) offered it to Plaintiff." (Docket No. 65 at 2) (citing Defendant's CSMF, Docket No. 35 at ¶¶ 24-26, 30, 32)).[37]  It has met its light burden by further presenting evidence, albeit primarily in the form of Ms. Waldman's testimony, that Plaintiff's employment terminated because she communicated acceptance of the proffered

---

[36] Defendant's further assertion that its replacement of the replacement (Ms. Ison) not long thereafter "with an individual who is the same age as [Plaintiff]" *preempts* a finding that Ison was "sufficiently younger" than Plaintiff is unsupported and is rejected as facially unfounded. (Docket No. 34 at 13).  The Court notes, however, that the timing of successive changes in Administrators coincident with/following Ms. Waldron's assumption of management of the personal care home may inform a jury's reasonable fact finding regarding, *e.g.*, the circumstances of Plaintiff's termination.

[37] *See also* Docket No. 34 at 13 ("In short, Norbert believed it provided [Plaintiff] with the role she always wanted – marketing, quality assurance, and customer service and not the role of an administrator.") (citing Defendant's CSMF at ¶¶ 21-28, 30).

RQAC position sufficient to Defendant's re-staffing her (relinquished but not yet vacated) Administrator position – with the candidate whom Plaintiff had herself vetted and approved. *Id.* ("Plaintiff initially accepted the offer for the new role, expressing her excitement for this new, desired opportunity as it utilized her very best gifts. . . . . Plaintiff even went as far as developing a strategy to vet her Administrator replacement (meeting with the candidate to ensure competency) and introduce her replacement to the management team.") (citing Defendant's CSMF at ¶¶ 30, 32, 37-39).[38] That position having been filled, Plaintiff's employment with Defendant necessarily ceased when she subsequently declined to assume (or "recanted") the part-time RQAC position created for her. *Id.* at 3.[39] Since Defendant has met its burden, the Court turns its analysis to step three of the *McDonnell Douglas* test – on which Defendant largely rests its asserted entitlement to summary judgment on this claim.[40]

### d. Plaintiff's Evidence of Pretext

To overcome Defendant's proffered legitimate non-retaliatory reason for its action, the burden shifts to Plaintiff to prove by a preponderance of the evidence that the reason proffered was *not* the true reason for Defendant's adverse action but was merely a pretext for discrimination. *Willis*, 808 F.3d at 644. To meet this burden, Plaintiff "must point to some evidence, direct or

---

[38] *See also* Docket No. 34 at 11-12 ("Ms. Rosnick also met with Ms. Waldman's proposed new Administrator, Misty Ison, on two (2) separate occasions, even informing Ms. Waldman that she felt Ms. Ison would be a good fit. It was only after [those meetings that Plaintiff] informed Ms. Waldman she would not accept the new role. However, . . . Ms. Waldman had already hired Ms. Ison, as she believed Ms. Rosnick was pleased with her new role and approved of Ms. Ison stepping in as the new Administrator.") (citing Defendant's CSMF at ¶¶ 35-39, 43-44).

[39] *See also* Docket No. 34 at 12 ("[O]n January 16, 2022, Ms. Waldman accepted [Plaintiff's] refusal of the new role as a resignation from employment with Norbert, as the Administrator role had been filled, and [Plaintiff]'s final day of employment with Norbert was January 18, 2022.") (citing Defendant's CSMF at ¶¶ 45-48).

[40] Docket No. 65 at 3 ("Simply put, the purported issues of fact related to whether she suffered an adverse action do not matter. Rather, there are no disputes regarding material issues of fact related to Defendant's legitimate, nondiscriminatory reasons for its actions with respect to Plaintiff" . . . and "Plaintiff's lack of evidence to carry her burden on pretext (as Plaintiff marshaled no evidence sufficient to satisfy her burden).").

circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir. 1992)).[41] These two prongs of the *Fuentes* test are distinct. *Keller,* 130 F.3d at 1108–13. Under this Court's analysis of the first independent prong, Plaintiff has met her burden to present evidence of pretext and disputed factual issues remain which preclude summary judgment.

The first prong of the *Fuentes* test focuses on whether Plaintiff has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reasons for the adverse action. To satisfy this prong and discredit the employer's proffer, Plaintiff cannot simply show that Defendant's decision was wrong or mistaken, since the factual dispute at issue is whether the employer was motivated by discriminatory animus. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them "unworthy of credence," and hence infer "that the employer did not act

---

[41] As the Court of Appeals has explained:

> To establish such circumstantial proof, the plaintiff first must present evidence that each of the defendant's reasons is pretextual, *viz,* each reason was "a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). This proof of pretext then may be combined by the factfinder with the evidence used to support the plaintiff's prima facie case of age discrimination, and from this union, the factfinder may reasonably infer that the defendant discriminated against the plaintiff because of his age. *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749.

*Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 136 (3d Cir. 1997) (footnote omitted).

for [the asserted] non-discriminatory reasons." *Fuentes,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531, 533) (other internal citations omitted).[42]

Plaintiff has presented evidence from which a fact finder could reasonably disbelieve Defendant's articulated reasons for her termination based on their degree of, *e.g.*, implausibility, inconsistency, and/or contradiction.  Summarizing the evidence in the light most favorable to Plaintiff:

Defendant asserts that Ms. Waldron created a substantially reduced time, independent contractor, RQAC position, with lower salary and reduced/eliminated benefits, for Plaintiff (then Defendant's full-time Administrator employee) to assuage Plaintiff's discontent by providing her "dream job".  The record includes evidence that although Plaintiff indicated – during her Spring 2021 meetings regarding potential employment – that she preferred a customer service position, she assumed the Administrator position and had been employed in that role for six months prior to Defendant's proposal that she transfer to a part-time RQAC position.[43]  More significantly, the record lacks evidence of conversations/consultations, meetings or other verbal or written communications between Ms. Waldron/Defendant and Plaintiff regarding either (a) any revisiting of the expressed preferences of her employment negotiation nine months prior, or (b) the parameters/components (*e.g.*, differing responsibilities, reduced number of hours, and reductions in salary and benefits) of the new position being created specifically for her.  *Cf.* Docket No. 61 at

---

[42] *See also Keller,* 130 F.3d 1101, 1109 (3d Cir. 1997) ("'The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'") (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir. 1996)).

[43] *Cf.* Docket No. 34 at 15 ("The undisputed evidence shows that [Plaintiff], from the outset of her employment, desired a role focused on marketing and overseeing multiple care homes operated by Norbert. Ms. Rosnick even drafted and presented to Norbert a description of the position she desired - Chief Experience Officer . . . .  In an effort to provide Ms. Rosnick with the role she truly desired . . ., Ms. Waldman created a new position specifically for [her] . . . .  [T]he function and duties of the role were based on the . . .  job description [Plaintiff] created and presented to Norbert . . . .) (citing Defendant's CSMF at  ¶¶ 21-26, 30).

52 (Plaintiff's averment that Defendant proposed her transfer without consulting her about the position).

Similarly, Defendant asserts that it hired Ison as Administrator to fill Plaintiff's voluntarily vacated place in reliance on Plaintiff's acceptance of her dream job. Yet the record lacks evidence – beyond the parties' conflicting and sometimes imprecise testimony – of the existence or timing of communication/documentation regarding either Defendant's (a) offer of a particularized transfer position to Plaintiff or (b) confirmation of its "impression" or "belief" (from, *e.g.*, Plaintiff's participation in screening a proposed replacement Administrator) that Plaintiff *had* accepted (vs. was engaged in considering) the RQAC position.  Finally, Defendant asserts that Ms. Waldron was surprised when Plaintiff subsequently disavowed/"recanted" her acceptance of the proposed transfer/demotion, and necessarily "accepted" Plaintiff's January 14th letter declining that position as her "resignation" because the Administrator position had been filled by Ison.  But here again, the evidentiary record reflects ambiguities and apparent inconsistencies. *See* Sections II and V(A)(2)(c), *supra*.

Because a reasonable jury could find that Defendant's averments are, *e.g.*, inconsistent and/or implausible and thus raise a question of discriminatory intent, summary judgment "must be approached with caution." *Lowe v. Philadelphia Newspapers, Inc*., 594 F. Supp. 123, 128 (E.D. Pa. 1984). When, as here, the Court concludes that a defendant's proffered reason for terminating Plaintiff's employment – grounded primarily in the parties' divergent testimony – raises material fact questions and credibility issues which preclude summary judgment,[44] the Court must then

---

[44] *See Oliver v. Universal Health Servs. Inc*., 2024 WL 868299, at *8 (E.D. Pa. Feb. 29, 2024) (denying summary judgment and noting lack of internal contemporaneous documentation regarding, *e.g.*, related meetings or communications); *id.* (citing *Johnson v. Verizon Servs. Corp*., 2017 U.S. Dist. LEXIS 59472 at *12 (E.D. Pa. Apr. 18, 2017) (finding genuine dispute of material fact as to pretext and denying summary judgment where there was a "lack of documentation concerning [the plaintiff's] termination" and where the Court "only has before it dueling narratives provided . . . as to [employer's] motivation")).

respect "the importance of having the witness examined and cross-examined in the presence of the court and jury." *Losch v. Borough of Parkesburg, Pennsylvania*, 736 F.2d 903, 909 (3d Cir. 1984). The relevant inquiry at this juncture is whether, from the evidence now available (including circumstantial evidence of inconsistencies or implausibilities in Defendant's proffered reason for termination), a jury could reasonably infer that Defendant illegally discriminated against Plaintiff. *See e.g., Graham v. F.B. Leopold Co.*, 779 F.2d 170, 173 (3d Cir. 1985). The Court answers that inquiry in the affirmative and accordingly denies Defendant's motion for dismissal of Plaintiff's ADEA discrimination claim.[45]

### e. Plaintiff's Ultimate Burden

In denying summary judgment on this claim, however, the Court reminds the parties that to establish Defendant's liability under the ADEA, Plaintiff must ultimately convince the trier of

---

[45] Having found, through its analysis under the first prong of the *Fuentes* test, that Plaintiff is entitled to proceed on this claim, the Court need not and does not rely upon an analysis under the second prong.  It notes, however, that it would be inclined to reach a different conclusion under the second prong, which looks to *affirmative* evidence that Defendant was motivated by discriminatory animus, *i.e.*, that age was the real reason for her termination. *Fuentes*, 32 F.3d at 762.  This prong calls upon a plaintiff to identify evidence that the employer: (1) "previously discriminated against her," (2) "discriminated against other persons within her protected class or within another protected class," or (3) treated similarly situated individuals outside the protected class more favorably.  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (citing *Fuentes*, 32 F.3d at 765).

 Relatedly, the Court finds that Waldman's alleged inquiry into/suggestion of Plaintiff's retirement during a holiday social event within a short time prior to Plaintiff's proposed transfer/demotion and ultimate termination of employment was not itself inherently evidence of pretext or discriminatory intent. *See e.g.*, *Boston v. Blue Cross & Blue Shield of Kansas*, 431 F.App'x 763, 767 (10th Cir. 2011); *Rexses v. The Goodyear Tire & Rubber Co.*, 401 F.App'x 866, 868 (5th Cir. 2010) ("An employer's inquiry into an employee's age and retirement plans is not by itself evidence of discriminatory intent"); *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992); *Misner v. Potter*, 2009 WL 1872598, *7 (D. Utah June 26, 2009) (distinguishing such inquiry from "trying to push out older executives because of stereotypes about age"); *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir. 2012) ( retirement planning questions such as "[w]hen are you going to retire?" . . . do not satisfy plaintiff's burden to demonstrate age animus when unrelated to decisional process at issue); *Folcher v. Appalachian Insulation Supply*, Inc., 2007 WL 1544693, ** 3-4 (E.D. Pa. May 24, 2007) (supervisor comments that plaintiff was "getting older . . . when are you going to retire?" did not rise to coercive inquiry and would not themselves support inference of age bias).  *Compare*, e.g., *Wargats v. Pittsburgh Tech. Inst.*, 2007 WL 81056, **2, 6 (W.D. Pa. Jan. 8, 2007) (denying summary judgment where employer questioned plaintiff about expected retirement four times in eight months even after plaintiff said he had no such plans to retire, and plaintiff presented other evidence of pretext); *Romantine v. CH2M Eng'rs, Inc.*, 2010 WL 5419017, **12-13 (W.D. Pa. Nov. 24, 2010). *Cf.* Docket No. 34 at 17-19 (citing Rosnick Dep. 187:10-188:25; Defendant's CSMF at ¶ 54 ).

fact that a *discriminatory animus was the real reason* for the adverse employment action at issue. *Fuentes*, 32 F.3d at 765. "Liability cannot be established upon a jury's mere disbelief of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's affirmative belief of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." *Venter v. Potter*, 694 F.Supp.2d 412, 423 (W.D. Pa. 2010), *aff'd*, 435 D.Appx. 92 (3d Cir. 2011) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 519) ("It is not enough, in other words, to disbelieve the employer; *the factfinder must believe the plaintiff's explanation of intentional discrimination*.") (emphasis added).[46] To that end, "[e]vidence that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000)).[47]  The Court has found only – on considering the evidence before it as a whole and under the standards explicated above – that a reasonable jury could so conclude.

### (3) ADEA Claim of Discriminatory Retaliation

The ADEA's anti-retaliation provision prohibits an employer from discriminating "against any of his employees . . . because such individual . . . has opposed any practice made unlawful by

---

[46] *See also McLaughlin v. International Brotherhood of Teamsters, Local 24*9, 641 F. Supp. 3d 177, 205 (W.D. Pa. 2022) (noting that employee's age must have "actually played a role in the employer's decision-making process and had a determinative influence on the outcome of that process"). *Cf.* Docket No. 34 at 17 (asserting that Plaintiff's same age at the time of both hire and separation evidences that the decision was not motivated by age) (citing *Mercantanti v. WCI Operations LLC*, 645 F.App'x 228, n. 8 (3d Cir. 2016) (Plaintiff's "claim of pretext is particularly implausible . . . because she  was the same age when hired her into the position … as when . . . fired [from it] six months later").

[47] *See also id.* ("Depending on the circumstances of the particular case at issue, a plaintiff can sometimes prevail on the basis of circumstantial evidence without introducing additional, independent evidence of discrimination. . . . Whether summary judgment is warranted in a given case depends upon the strength of the plaintiff's prima facie case, the probative value of the evidence discrediting the defendant's proffered reasons for the challenged employment action, and the presence or absence of additional evidence that may properly be considered by a court in determining whether a judgment as a matter of law is appropriate.") (citing *Reeves*, 530 U.S. at 149).

this section." 29 U.S.C. § 623(d). To establish a prima facie case for retaliation, the plaintiff must demonstrate "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)); accord *Kowal v. Ferndale Area Sch. Dist.*, 2023 WL 110541, at *2 (3d Cir. Jan. 5, 2023), *cert. denied*, 144 S. Ct. 280 (2023); *Kochka v. Allegheny Health Network*, 2023 WL 2216286, at *5 (W.D. Pa. Feb. 24, 2023). *Cf. James Protein v. Greenman-Pederson, Inc.*, 2024 WL 4471086, at *6 (W.D. Pa. Oct. 11, 2024) (noting that "the Supreme Court [has] defined retaliation broadly as conduct that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.") (citing *Burlington Northern*, 548 U.S. at 57).

Defendant avers that although Plaintiff's Complaint alleges that she "engaged in protected activity by reporting age discrimination to Norbert", her deposition testimony is that she was unaware of this claim, never made a complaint to Norbert about alleged age discrimination and does not believe she was retaliated against. Docket No. 34 at 20 (citing Docket No. 23 at ¶¶ 38, 48, 50; Defendant's CSMF at ¶¶ 56-57). It further avers that the record is "entirely devoid of any evidence that [Plaintiff] engaged in protected activity." *Id.* The Court concurs that Plaintiff fails to state a prima facie case of retaliation.  More specifically, Plaintiff cannot, without more, maintain a retaliation claim grounded on either (a) rebuffing a holiday inquiry/suggestion regarding her retirement with a reply that she did not intend to retire or (b) declining to accept a proposed transfer/demotion desired by Defendant.

To constitute "protected activity", the actions taken by an employee need not have been formal, and activities such as making complaints to management or writing critical letters may be protected, because it is the message conveyed not "the means of conveyance" that determines whether the activity is protected. *Curay–Cramer v. Ursuline Acad.*, 450 F.3d 130, 135 (3d Cir. 2006). The opposition to an illegal employment practice must, however,  identify the practice complained of,  "at least by context." *Id.*  Plaintiff's assertion that she did not intend to retire, or her act of declining the RQAC position (even despite pressure to accept it), simply do not rise to the level of  a protected complaint of, or expressed opposition to, a discriminatory employment practice or adverse action on which she may maintain a claim of discriminatory retaliation.  *See, e.g.*, *Barber v. CSX Distribution Services*, 68 F.3d 694, 701–02 (3d Cir. 1995) (holding that communication to employer that did not explicitly or implicitly allege the occurrence of an age-based unfairness did not charge discrimination and was not protected conduct); *Woods v. Salisbury Behavioral Health, Inc.*, 3 F.Supp.3d 238, 253–55 (M.D. Pa. 2014) (holding that employee's conversational inquiry into status of her application for another position failed to constitute protected activity for purposes of prima facie case of retaliation where there was no evidence of record that she alleged an age-discriminatory reason that her application had not been accepted); *id.* at 255 (further noting that it appeared employee "did not even make a general complaint about [employer's] hiring process" during her conversation).[48]

---

[48] *Cf.* Docket No. 50 at 6, ¶ 56 (Plaintiff "did not realize she was being discriminated against on the basis of her age until after she was terminated . . . and replaced with Ms. Ison."); Docket No. 49-1 (Plaintiff's Depo. at 18); Docket No. 61 at 47 (Plaintiff made no complaint to Defendant of age discrimination by Waldman's speaking to her about retirement).

In sum, Plaintiff has provided evidence from which a reasonable jury could reject as pretextual Defendant's proffered reason for Plaintiff's termination (*i.e.*, that it was an unintended consequence of its attempt to meet her preferred job criteria).  And she has provided evidence from which a reasonable jury could even reach an ADEA verdict in her favor informed by factors including, *e.g.*, (a) Defendant's unsolicited proposal of a reduced salary and benefit  position and (b) the age difference between Plaintiff and her replacement.  But Plaintiff has failed to demonstrate the elements of a retaliation claim.

Defendant's Motion for Summary Judgment will therefore be granted as to this claim of retaliation.

**B.  Plaintiff's Evidence Is Sufficient to a Reasonable Jury's Finding that Defendant Failed to Pay Her Contractually-Obligated Bonus and/or PTO in Violation of the WPCL**

The WPCL is a statutory remedy for an employee "when the employer breaches a contractual obligation to pay earned wages." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990); *Rosario v. First Student Mgmt., LLC*, 247 F.Supp.3d 560, 568 (E.D. Pa. 2017). As recently summarized by the Court for the Eastern District of Pennsylvania:

> To state a WPCL claim, "the employee must aver a contractual entitlement to 'compensation from wages' and a failure to pay that compensation." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 954 (Pa. Super.2011) (quoting *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. 2005)). "Wages" for purposes of the WPCL include "all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation" and "fringe benefits or wage supplements," such as bonuses or "any other amount to be paid pursuant to an agreement to the employee[.]" 43 PA. CONST. STAT. ANN. § 260.2a. "[A]bsent a formal employment contract or collective bargaining agreement, an employee raising a WPCL claim would have to establish, at a minimum, an implied oral contract between the employee and employer." *Braun*, 24 A.3d at 954 (citing *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)). "The burden of proving the existence of a contract lies with the party relying on its existence." *Edmondson v. Zetusky*, 674 A.2d 760, 764 (Pa. Commw.1996). "To establish the existence of an agreement, one must show that: (1) both parties have manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and (3) there is mutuality of consideration." *Redick v. Kraft, Inc.*, 745 F. Supp. 296, 300 (E.D. Pa. 1990) (citing *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986)). "For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain." *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. 2006).

*Oliver v. Universal Health Servs. Inc.,* 2024 WL 868299, at *9 (E.D. Pa. Feb. 29, 2024).[49]

---

[49] *See also id.* at *9, n. 11 ("Where an oral contract is involved, 'courts must look to surrounding circumstances and course of dealing between the parties in order to ascertain their intent.' *Szymanski v. Sachetta*, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012) (quoting *Boyle v. Steiman*, 631 A.2d 1025, 1033 (Pa. Super. 1993).").

**(1) Plaintiff's Employment Bonus Claim**

Plaintiff alleges that she had an enforceable contract with Waldman, who had authority/agency at the time of her employment, for a $56,000 bonus – the first half payment of which was made on July 29, 2021 and the second half payment of which was due to her in January 2022 but remains unpaid.   In support thereof, Plaintiff submitted the documentary evidence detailed in Section II.

 Defendant contends that Plaintiff cannot sufficiently evidence either that a contract existed or that she was entitled to an additional $28,000 in January 2022.  More particularly, it asserts that (a) Plaintiff's July 23, 2021 email identified no material terms and was indefinite as to the amount she entrusted Waldman to calculate fairly, and (b) Waldman made no response prior to January, 2022 at which time he only "vaguely replied . . . without affirmatively endorsing" either her email or that any further bonus was owed.  (Docket No. 34 at 23). Defendant's characterization of Plaintiff's evidence fails to acknowledge that in response to Plaintiff's communication that she trusted Waldman to set the fair amount of her bonus – importantly, a bonus to specifically be paid in two equal installments at a six-month interval of July 29, 2021 and January 2022 – Defendant then paid Plaintiff $28,000, designated as a "bonus", on the first date specified.  This need not, of course, have been accompanied by an email stating, *e.g.*, "Pursuant to your email, Norbert has issued a check of $28,000 – which I have determined to be fair - in payment of the first half of your bonus", for a jury to conclude that effect.

To the extent there was no sufficiently definite agreement prior to that time, a reasonable jury could certainly find that the bonus payment tendered by Defendant subsequent to receipt of Plaintiff's July 23rd email, and Plaintiff's acceptance of it, sufficed to complete the terms of a

mutually enforceable contract.  On the other hand, Defendant's contention that its July 2021 payment of $28,000 was understood and intended to comprise a once-and-done resident transfer bonus in keeping with its prior practices is it not entirely unsupported.  *See* Docket No. 34 at 22-23 (citing Defendant's CSMF at ¶¶ 13, 59, 61-65).  Nor is it unequivocally contradicted by Waldman's succinct and arguably vague  January 2022 replies of "Thanks for the reminder" and "No problem".[50]

Although the question of whether an undisputed set of facts establishes a contract is typically one of law, where, as here, material facts are in dispute, the question of whether a contract was formed is for the jury. *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 482 (Pa. Super. 1984). *See also Solomon v. Luria*, 246 A.2d 435, 438 (Pa. Super. 1968) ("What was said and done by the parties as well as what was intended by what was said and done by them are questions of fact for the jury."). At the cross-motion for summary judgment stage, the court must determine whether a reasonable jury could reasonably find either that the parties did or did not form the enforceable two-payment contract alleged. The Court concludes, on the analysis and evidence above, that Plaintiff has pointed to evidence that, while not *preclusive* to a jury finding in Defendant's favor, is also far more than sufficient to a jury finding that she was entitled to two half-payments of $28,000.  Summary judgment will therefore be denied on this claim.

### (2) Plaintiff's PTO Claim

As reflected in Section II's lengthy factual background, Plaintiff has provided, as evidence in support of her claim for entitlement to approximately $17,000 in accrued PTO, primarily her own and Kirik's deposition testimony regarding payment owed under an oral contract with

---

[50] A reasonable jury could, of course, consider the changes in Plaintiff's employment relationship with Defendant in that six-month interval in reaching conclusions on the January replies' meaning/intent and, moreover, on Plaintiff's claim as a whole.

Waldman and/or the PTO provisions of the 2018 Handbook.[51]  As also reflected in Section II, Defendant – by conflicting testimony/evidence - has raised a material fact question of which Handbook terms govern Plaintiff's entitlement to accrued PTO – the 2018 Handbook which conditionally provides payment for unused PTO on termination/resignation, or the 2022 Handbook which does not.  Significantly, neither Handbook expressly addresses any entitlement to payment for PTO accrued with a prior employer.  Nor do Defendant's scant employment/payroll records inform the question, as such records ofttimes might by, *e.g.*, further documentation of Plaintiff's credited PTO and the related tallying of additions and usage subtractions thereto. [52]

Here then as elsewhere - owing in significant part to Defendant's election to forego more complete business record keeping - factual and credibility questions await the jury and summary judgment on this WPCL claim is precluded.

---

[51] Plaintiff also provides an undated email from Waldman to Aiello, the former Administrator, setting forth terms of his employment, including (a) starting salary, (b) Norbert PTO days (10) and conditions for payment of accrued PTO on resignation, and (c) compensation of $1,536 for PTO days accrued with prior employer.  Docket No. 48-12. Defendant contests the consideration of this email in support of the Court's rulings on the pending motions for summary judgment.  *See* Section V(B)(3), *infra*.

[52] Following the Court's July 29, 2024 hearing on the pending motions, Defendant submitted evidence in support of its averment that claims for unpaid PTO made by other staff who had transferred from Oakleaf were "dismissed" by the Pennsylvania Department of Labor.  *See* Docket No. 65 at 5 ("The PA DLI commenced an investigation and then dismissed the investigation as to all three claimants.").  The email correspondence submitted indicates that on October 23, 2023, a Labor Investigator replied to Waldman's request for copies of the 2022 letters of dismissal, saying:

> I don't think any letters were distributed . . . but I remember [your telling me by phone that] your attorney was not [doing] your work on the case, but he was billing you for services.  You mentioned the companies [sic] PTO policy [and submitted it for review at my request] and the policy had no payout for PTO.  It was also my understanding based on our phone conversation that there was also pending litigation on this issue.  The BLLC cases were closed based on the submitted policy and pending litigation.

(Docket No. 65-2).  This email does not affect the Court's conclusion that material fact questions preclude summary judgment for either party on Plaintiff's PTO claim.  The Court must note, however, the reply's suggestion that the BLLC Labor Investigator closed these former employees' PTO claims in reliance on Waldman's communications and perhaps in mistaken belief that (1) the 2022 Handbook which Waldman provided undisputedly governed their claims and/or (2) those employees were now pursuing resolution of their PTO claims through other means, *i.e.*, litigation. In short, a reasonable jury may find the BLLC's case closing unpersuasive as to the invalidity of Plaintiff's claim.

**(3) Evidentiary Considerations Raised by Defendant**

The Court need not, at this juncture, further address the parties' conflicting views of the admissibility of the presently unauthenticated undated email from Waldman to Defendant's prior Administrator – *i.e.*, the Aiello Letter (Docket No. 49-12), as the evidentiary record is independently sufficient to preclude summary judgment on Plaintiff's WPCL claims. *Compare* Docket No. 67 at 3, 5-8 (asserting that letter documents Norbert's similar agreement with prior administrator for both (a) transferred-residents-based bonus and (b) additional compensation for PTO accrued under prior employer); Docket No. 61 at 25-27 (Aiello made a claim against Defendant for a resident-transfer bonus, which was settled, and Waldman's email promised monetary compensation to cover PTO accrued with prior employer) *with* Docket No. 65 at 4 (asserting that letter is "improper and irrelevant" and "[a]t best . . . demonstrates that when Mr. Waldman deviates from what is stated in the handbook or the normal course of business, he does in fact reduce such deviations to writing – thereby undermining Plaintiff's contentions").

Defendant argues that the Aiello Letter must be disregarded for summary judgment purposes because it is not yet "authenticated", so as to be admissible into evidence. *See* Docket No. 65 at 4) (citing Fed. R. Civ. P. 56(c)). That Rule provides, at 56(c)(1), that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, . . . or other materials". By its terms, Rule 56(c) requires only that a cited document be "in the record" (as the Aiello Letter plainly is), and not that it be in admissible form. Rule 56(c) resolves this issue by providing that "[a] party may object that the material cited . . . cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Here, Defendant objects that the Aiello Letter *is not* in admissible form; it makes no claim that said letter *cannot be* presented in such a form.  Under Third Circuit precedent, evidence "can be considered on a motion for summary judgment [where] it is capable of being admissible at trial." *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1235 n.9 (3d Cir. 1993).[53]  Moreover, the facts at issue are whether the parties had a contractually-binding agreement for Defendant's payment of PTO and/or a bonus.  As canvassed in Section V, *supra*, even without the Aiello Letter, Plaintiff's position is, as to both these claims, sufficiently supported by her direct deposition testimony and other evidence of record to present material fact questions for a jury. Indeed, as to her WPCL claim for a remaining bonus payment, it appears amply supported.

## VI.    CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (Docket No. 33) is granted as to Plaintiff's ADEA and PHRA claims for discriminatory retaliation and denied as to her other claims, and Plaintiff's Motion for Partial Summary Judgment (Docket No. 38) is denied. An appropriate Order follows.


Dated:  November 14, 2024

*/s Nora Barry Fischer*
Nora Barry Fischer, Senior U.S. District Judge

cc/ecf: All counsel of record

---

[53] *See also Weitzner v. Sanofi Pasteur, Inc.*,  2017 WL 3894888, at *7 (M.D. Pa. Sept. 6, 2017), *aff'd*, 909 F.3d 604 (3d Cir. 2018) ("[O]therwise inadmissible evidence may be considered on summary judgment if the evidence is capable of being presented in an admissible form at trial.") (citing *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) ("We thus concluded that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial.").